OPINION OF THE COURT
Bruce M. Kaplan, J.
The protection afforded by the First Amendment to the free exercise of religion does not extend to matters of personal conscience even when a person’s religious vows *568 provide that he cannot be forced to surrender his dignity as a person by doing things against his conscience.
For this reason respondent, Anthony D., has failed to persuade the court that an order directing him to submit to an HLA composite blood-grouping test would contravene constitutionally protected religious convictions.
When the instant matter first appeared before this court, respondent’s counsel claimed that an order directing his client to submit to an HLA composite blood-grouping test would contravene his client’s religious strictures in violation of his First Amendment right to the free exercise of his religion. Thereafter he availed himself of the leave given by the court to submit documents, affidavits and a memorandum of law substantiating his claim. The Commissioner of Social Services was granted similar leave, but his counsel declined to make a submission.
The free practice of one’s religion is a right deeply cherished by the citizens of our State and Nation, and one that is zealously protected by the free exercise clause of the First Amendment. (Thomas v Review Bd., Ind. Employment Security Div., 450 US 707.)
This constitutional guarantee of freedom of religion “embraces two concepts, — freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be. Conduct remains subject to regulation for the protection of society.” (Cantwell v Connecticut, 310 US 296, 303-304.)
In order to assess a claimed violation of the First Amendment right of free exercise, it is necessary to conduct a limited inquiry so as to determine whether or not an act based on religious belief is involved.
While mindful of the delicacy implicit in determining what is a religious belief or practice entitled to constitutional protection, “the very concept of ordered liberty precludes allowing every person to make his own standards on matters of conduct in which society as a whole has important interests.” (Wisconsin v Yoder, 406 US 205, 215-216.)
The Supreme Court and the Congress have become increasingly persuaded of the wisdom of broadening the definition of religion eligible for constitutional protection. *569 While United States v Seeger (380 US 163) interpreted the exemption section of the Universal Military Training and Service Act, it unequivocally articulated the proposition that the term “religious training and belief” should be afforded the most expansive possible reading, one not limited by orthodox or traditional notions. Where a belief emanated from religious training or belief in contrast to a merely personal code, its adherent would be entitled to an exemption from military service.
Our courts have been solicitous of a congery of sincerely held beliefs based on religious convictions.
In Sherbert v Verner (374 US 398) the court held it unconstitutional to deny unemployment compensation to a Seventh Day Adventist who refused employment when her employer required her to work a six-day week when her religion proscribed working on Saturday which was its Sabbath.
In Thomas (supra) the Supreme Court held that Indiana violated Mr. Thomas’ First Amendment right when it denied him unemployment compensation because he terminated a job which required him to participate in the production of armaments, an activity inimical to his religious convictions. The fact that another Jehovah’s Witness interpreted this work as scripturally acceptable was considered irrelevant.
The court stated that it was inappropriate for it to act as an arbiter of scriptural interpretation, and held that the applicable test was whether Thomas possessed an honest conviction that such work was forbidden by his religion.
In Stevens v Berger (428 F Supp 896) Judge Weinstein, with his customary clarity, sensitivity and scholarship, held that Stevens was unconstitutionally denied public assistance when his sincerely held religious beliefs impelled him to refuse to obtain Social Security numbers for his children.
Judge Weinstein employed a twofold test:
(1) that a belief must be sincerely held; and
(2) that it be rooted in theological conviction.
He found that plaintiff’s opposition to obtaining Social Security numbers for his children stemmed from his belief *570 that they constituted “the mark of the beast”, reproved in Revelations as a tool of Antichrist, and that their possession would impair the ability of his children to enter Heaven. This belief emanated from plaintiff’s own interpretation of Revelations and not from a doctrinal interpretation of the American Lutheran Church, a religion which was characterized as “Messianic Judaism”. After reviewing the relevant history, literature and theological commentary submitted by plaintiff, Judge Weinstein concluded his belief was religious.
The facts in Stevens (supra) stand in stark contrast to the instant situation. While recognizing that the respondent’s failure to cite any specific reference in the rules and general constitutions of the Order of St. Matthew proscribing the giving of blood by its postulants is not dispositive of the issue (Thomas v Review Bd., Ind. Employment Security Div., supra) its absence necessarily limits the manner in which respondent can demonstrate the religious nature of his belief.
He has, in a self-serving manner, baldly asserted that it is against his religious convictions and his conscience to give blood (that is, have a miniscule amount of blood drawn for testing purposes).
The court will assume, arguendo, that this belief is sincerely held,* thus allowing the first part of the test to be met.
His attempt to meet the second part of the test results in failure.
The only proof offered in support of his position is an unsworn letter from Reverend Mark Forry, Provincial of the Order of St. Matthew (Province of St. Joachim) stating: “As a matter of conscience he can never be forced to surrender his dignity as a person by doing things against his conscience or his personal welfare.”
Respondent, himself, in an affidavit in opposition to the direction for a blood test, merely stated that submitting to *571 the blood test is against his religious convictions because it is an integral part of his religion to follow his conscience as his convictions lead. He did not suggest any scriptural or doctrinal basis for his refusal, and he failed to establish any nexus between his refusal to submit to a blood test and a “fundamental” mandate or “cardinal principle” of his religion as did the respondents in Wisconsin v Yoder (supra) and Sherbert v Verner (supra) or provide the wealth of material employed in Stevens (supra) to link the plaintiff’s belief with those which were unassailably religious.
Respondent’s action amounts to a subjective evaluation and rejection of a validly enacted statutory scheme. His choice is philosophical and personal rather than religious. As such respondent’s actions are not protected by the free exercise clause. As the court stated in Wisconsin v Yoder (supra) “the very concept of ordered liberty precludes allowing every person to make his own standards on matters of conduct in which society as a whole has important interests.” (406 US, at pp 215-216.)
The courts of our State have been disinclined to afford First Amendment protection to matters of personal conscience even where a religious tenet taught a person to follow the dictates of their conscience.
In McCartney v Austin (31 AD2d 370), Judge (then Presiding Justice) Gibson affirmed the dismissal of a declaratory judgment action brought by the father of a student seeking an exemption from compulsory immunization against polio afforded to persons belonging to religious organizations whose teachings are contrary to immunization. Plaintiff was a Roman Catholic, a religion not positing a doctrinal position on immunization. Nonetheless he contended that his religion required him to follow his moral convictions, and it was his deep moral conviction that his son should not be immunized.
The holding was predicated, inter alla, on a finding that plaintiff’s opposition was based on personal moral scruples which were not within the intendment of the statute.
In Matter of Elwell (55 Misc 2d 252) a claim of religious exemption from immunization was denied. Respondent’s religion was silent on the question of immunization, and the court rejected.his contention that his religion is his *572 conscience which tells him immunization is wrong and thereby contrary to his conscience and personal convictions.
Since respondent’s opposition to the HLA composite blood-grouping test is based on his conscience and personal convictions, an order that he submit to the test does not violate his right to the free exercise of his religion. For this reason the court declines to consider whether there had been demonstrated an overriding governmental interest sufficient to impose a limitation on respondent’s free exercise of his religion.
ORDERING RESPONDENT TO SUBMIT TO A BLOOD TEST DOES NOT CONSTITUTE AN UNREASONABLE SEARCH
Respondent’s argument that compelling him to submit to a blood test would violate his right to be secure against unreasonable searches is without merit. In Schmerber v California (384 US 757) the court held that compulsory blood tests, which are conducted under circumstances involving legitimate State interests and which are properly administered, do not violate an individual’s right to be secure against unreasonable searches. The concern for the welfare of a child, an underlying objective of a paternity proceeding, represents a matter of legitimate State interest, and under the test set forth in Schmerber (supra) justifies a compulsory blood test. (Matter of Pamela P. v Frank S., 59 NY2d 1; Merrill v Ralston, 95 AD2d 177; Matter of Jane L. v Rodney B., 108 Misc 2d 709, 712-713.) Therefore, respondent’s second argument fails.
THE BLOOD GROUPING TEST RESULTS SHOULD BE OBTAINED PRIOR TO COMMENCEMENT OF THE TRIAL
Respondent argues that the court’s order would be premature because petitioner has not overcome the presumption that the child is the legitimate daughter of the man to whom petitioner was married at the time of the child’s birth. This argument is premature at this stage of the proceeding.
The presumption that a child born to a married woman is presumed to have been fathered by her then husband is *573 well established and is “one of the strongest and most persuasive known to the law.” (.Matter of Findlay, 253 NY 1, 7.)
However, the presumption is not conclusive, but, rather can be overcome by clear and convincing evidence of illegitimacy. (Schenectady County Dept, of Social Seros, v Hilvan RR, 57 AD2d 688; Richardson, Evidence [10th ed], § 59.) The presumption of legitimacy is a rule of evidence rather than a rule of substantive law. Thus, whether petitioner can overcome the presumption is a question of fact which can be determined only after a full plenary hearing when the court can consider all the evidence adduced, including the results of the HLA blood test. (Matter of Hanley v Flanigan, 104 Misc 2d 698, 701.)
To suspend the administration of the HLA test until after petitioner presents evidence rebutting the presumption of legitimacy would be to offend common sense, public policy and reason. The efficacy of the HLA test as an evidentiary tool in resolving paternity disputes was recognized by the Legislature, when it amended sections 418 and 532 of the Family Court Act to allow such test results to be received into evidence. It chose not to impose limitations of the type proposed by respondent upon the use of HLA tests. It would be senseless to commence a trial for the purpose of establishing nonaccess by the husband of the child’s mother, and then continuing the trial for the purpose of receiving test results which in the first instance might have excluded the respondent. Since the test is highly accurate on the issue of paternity, it should be utilized to avoid unnecessary litigation. (Matter of Joanne O. v Andrew H. W., 87 AD2d 615; Merrill v Ralston, supra.)
Accordingly, respondent is ordered to submit to an HLA composite blood test on a date to be chosen, and this matter is set down for hearing in Part C, Kings County Family Court, on November 3, 1983.

 It should be noted that respondent is a member of the New York City Transit Authority Police. It is hard to believe that he would refuse to give blood if one of his fellow officers were in need of it as a result of being shot, stabbed or otherwise injured. It is similarly hard to believe that he would refuse to have his blood drawn in connection with the physical exams that police officers must regularly undergo.